OPINION
{¶ 1} Appellant, Miracit Development Corporation, Inc. ("Miracit"), appeals the decision of the Board of Tax Appeals ("BTA") denying tax exempt status to certain real property owned by Miracit. For the reasons that follow, we reverse the decision of the BTA and remand the matter for further proceedings.
 {¶ 2} Miracit is an Ohio nonprofit corporation originally formed by the Living Faith Apostolic Church as a faith-based community development corporation and is recognized by the Internal Revenue Service ("IRS") as a 501(c)(3) organization. The specific purpose of Miracit, as set forth in its articles of incorporation, is to "assist and promote the well-being of the residents of deteriorated and economically depressed neighborhoods in the Columbus inner city" by engaging in such activities as housing development and redevelopment, economic development, job training, and recreational improvements. In furtherance of that goal, Miracit formed an independent nonprofit corporation, FCI, Too, Inc., ("FCI, Too"), the express purpose of which, as set forth in FCI, Too's articles of incorporation, is to operate a day care center for children. FCI, Too is also recognized by the IRS as a 501(c)(3) organization.
 {¶ 3} On January 12, 2001, Miracit purchased an existing day care facility in the revitalization area. FCI, Too leased the property from Miracit in order to operate the day care center. The five-year lease agreement required FCI, Too to pay Miracit annual rent of $60,000 in year one, $64,000 in years two and three, and $68,000 in years four and five.
 {¶ 4} In December 2001, Miracit filed an application seeking real property tax exemption for the day care facility for tax year 2001 and remission of taxes and penalties for tax year 2000; however, the application was not received by the tax commissioner until January 8, 2002. As Miracit failed to specify in the application the statutory basis under which it sought exemption, the commissioner considered R.C. 5709.12
and 5709.121 as possible grounds for exemption. Because Miracit did not own the property as of the 2001 tax lien date, January 1, the commissioner determined that he could not consider the exemption for 2001 or prior tax years; accordingly, he considered the exemption for tax year 2002 only. The commissioner ultimately concluded that the property was not entitled to exemption.
 {¶ 5} Thereafter, Miracit appealed the commissioner's decision to the BTA and, on June 25, 2003, a hearing was conducted on the matter. On February 27, 2004, the BTA affirmed the commissioner's decision denying the exemption for 2002.
 {¶ 6} Miracit appeals the BTA's determination and sets forth the following ten assignments of error:
1. The Board of Tax Appeal erred to the prejudice of appellant when it determined, as a matter of law, or issue of fact, that the day care facility in question is not charitable as that concept has been construed under section 57.09.121(A)(2) [sic] of the Ohio Revised Code.
2. The Board of Tax Appeal erred to the prejudice of the appellant when it determined, as a matter of law, or issue of fact, that the real property at issue was not used by Miracit, or by another institution under a contract with Miracit, for a charitable and/or public purpose.
3. The Board of Tax Appeal erred to the prejudice of the Appellant when it determined, as a matter of law, or issue of fact, that the real property at issue was not made available to FCI, Too, Inc. for the limited purpose of furtherance of one of Miracit's goals-creation of a day care for low income residences [sic].
4. The Board of Tax Appeal erred to the prejudice of the Appellant when it determined, as a matter of law, or issue of fact, that the lease between Miracit and FCI, Too, Inc. was for profit.
5. The Board of Tax Appeal erred to the prejudice of the Appellant when it determined, as a matter of law, or issue of fact, that the lease at issue was a traditional commercial lease rather than merely a vehicle to pay the mortgage and related property expense.
6. The Board erred to the prejudice of the Appellant when it determined, as a matter of law, or issue of fact, that the lease at issue generated rental income.
7. The Board of Tax Appeal erred in that it failed to give proper weight to the evidence offered by Miracit regarding the nature and scope of the lease at issue.
8. The Board of Tax Appeal erred in that its decision is not supported by applicable legal authority and said decision is not based on relevant, creditable [sic] and reliable facts.
9. The Board of Tax Appeal erred in that its decision is unreasonable, arbitrary, and capricious, exceeds its power, and is against the manifest weight of evidence.
10. The Board of Tax Appeal erred in that its decision is an abuse of its discretion.
 {¶ 7} Miracit concedes in its brief that its ten assignments of error are interrelated and essentially present one argument; accordingly, we will address the assignments of error together. In essence, Miracit argues that the BTA erred in denying tax exempt status to the day care facility under R.C. 5709.12 and 5709.121. An appellate court may reverse a decision of the BTA only "when it affirmatively appears from the record that such decision is unreasonable or unlawful." Witt Co. v. HamiltonCty. Bd. of Revision (1991), 61 Ohio St.3d 155, 157. It is not the function of an appellate court to substitute its judgment for that of the BTA on factual issues. Bethesda Heathcare, Inc. v. Wilkins,101 Ohio St.3d 420, 2004-Ohio-1749, at ¶ 18. However, the BTA's factual determinations must be supported by sufficient probative evidence. Id., citing Hawthorn Mellody, Inc. v. Lindley (1981), 65 Ohio St.2d 47, syllabus.
 {¶ 8} In Ohio, all real property is subject to taxation, except that which is expressly exempted. R.C. 5709.01(A). The General Assembly's authority to exempt property is derived from Section 2, Article XII of the Ohio Constitution, which provides, in relevant part, that "[w]ithout limiting the general power, subject to the provisions of Article I of this constitution, to determine the subjects and methods of taxation or exemptions therefrom, general laws may be passed to exempt * * * institutions used exclusively for charitable purposes * * *." The rationale justifying the granting of an exemption is that "there is a present benefit to the general public from the operation of the charitable institution sufficient to justify the loss of tax revenue." White CrossHosp. Assn. v. Bd. of Tax Appeals (1974), 38 Ohio St.2d 199, 201. Exemption from taxation is the exception to the general rule, and statutes granting exemptions must be strictly construed. Seven HillsSchools v. Kinney (1986), 28 Ohio St.3d 186. The burden rests with the party claiming an exemption to demonstrate that the property qualifies for the exemption. True Christianity Evangelism v. Zaino (2001),91 Ohio St.3d 117, 118, citing OCLC Online Computer Library Center, Inc.v. Kinney (1984), 11 Ohio St.3d 198, 201.
 {¶ 9} R.C. 5709.12(B) states, in pertinent part:
* * * Real and tangible personal property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation * * *.
 {¶ 10} R.C. 5709.121 provides:
Real property and tangible personal property belonging to a charitable or educational institution or to the state or a political subdivision, shall be considered as used exclusively for charitable or public purposes by such institution, the state, or political subdivision if it meets one of the following requirements:
(A) It is used by such institution, the state, or political subdivision, or by one or more other such institutions, the state, or political subdivisions under a lease, sublease, or other contractual arrangement;
(1) As a community or area center in which presentations in music, dramatics, the arts, and related fields are made in order to foster public interest and education therein;
(2) For other charitable, educational, or public purposes;
(B) It is made available under the direction or control of such institution, the state, or political subdivision for use in furtherance of or incidental to its charitable, educational, or public purposes and not with the view to profit.
 {¶ 11} The Ohio Supreme Court explained the interplay between the foregoing statutes in Episcopal Parish of Christ Church, Glendale v.Kinney (1979), 58 Ohio St.2d 199, wherein the court approved the concurring opinion of Justice Stern in White Cross, supra, at 203-204:
Initially, it is important to observe that, although R.C. 5709.121
purports to define the words used exclusively for "charitable" or "public" purposes, as those words are used in R.C. 5709.12, the definition is not all-encompassing. R.C 5709.12 states: "* * * Real and tangible personal property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation." Thus, any institution, irrespective of its charitable or non-charitable character, may take advantage of a tax exemption if it is making exclusive charitable use of its property. See Wehrle Foundation v. Evatt (1943), 141 Ohio St. 467,49 N.E.2d 52. The legislative definition of exclusive charitable use found in R.C. 5709.121, however, applies only to property "belonging to," i.e., owned by, a charitable or educational institution, or the state or a political subdivision. The net effect of this is that R.C. 5709.121 has no application to noncharitable institutions seeking tax exemption under R.C. 5709.12. Hence, the first inquiry must be directed to the nature of the institution applying for an exemption. * * *
In my view, the overall purpose of R.C. 5709.121 is to declare that the ownership and use of property need not coincide for that property to be tax exempt. If a qualified institution, or governmental unit, owns property, that property is exempt from taxation if (1) the institution or governmental unit itself uses the property as specified in R.C.5709.121(A)(1) or (A)(2); (2) the institution or governmental unit contractually allows another qualified institution or governmental unit to use the property as specified in R.C. 5709.121(A)(1) or (A)(2); or, (3) the institution or governmental unit makes the property available to anyone besides another qualified institution or governmental unit, for a nonprofit use that is in furtherance of, or incidental to the owner-institution's (or owner-governmental unit's) charitable purposes. * * *
 {¶ 12} Summarizing Justice Stern's opinion, the court, in OlmstedFalls Bd. of Edn. v. Tracy (1997), 77 Ohio St.3d 393, 396, stated:
Thus, in deciding whether property is exempt under the charitable use provisions of R.C. 5709.12 and 5709.121, tax authorities must first determine whether the institution seeking exemption is a charitable or noncharitable institution. If the institution is noncharitable, its property may be exempt if it uses the property exclusively for charitable purposes. If the institution is charitable, its property may be exempt if its uses the property exclusively for charitable purposes or it uses the property under the terms set forth in R.C. 5709.121.
 {¶ 13} In the instant case, without making an express determination as to whether Miracit is a charitable or noncharitable institution, the commissioner found that the challenged property did not qualify for tax exempt status under R.C. 5709.12 because Miracit used the property "for the non-exempt purpose of generating revenue through commercial leasing." The commissioner further found that the property was not exempt under R.C. 5709.121(B), as it was "used with a view to profit as evidenced by the lease and rental charge."
 {¶ 14} At the June 25, 2003 hearing before the BTA, Sharon Francis, the program director for Miracit, testified that Miracit obtained funding for the day care project from the city of Columbus and a local bank which was utilized to acquire the property and provide start-up capital for FCI, Too to operate the day care center. She further testified that Miracit and FCI, Too kept separate books and records. She also stated that rent payments made by FCI, Too under the lease agreement were utilized by Miracit solely to repay the debt incurred in acquiring the property.
 {¶ 15} Ms. Francis also testified that although the day care center was established primarily to serve economically disadvantaged families through Title XX funding, the center actually served both Title XX families and private pay families and the tuition fees charged were the same for both groups. She further stated that she was unaware of any restrictions as to the minimum percentage of Title XX qualified clients the center was required to serve. However, she noted that the center primarily served low income clients. She initially stated that "better than 50 percent" of the families served by the day care center were Title XX qualified. (Tr. 14.) When asked to provide more detail as to the ratio of Title XX to private pay families, Ms. Francis estimated that "at least 75 percent" of the center's clients were Title XX qualified. (Tr. 26.)
 {¶ 16} In its decision filed after the hearing, the BTA noted that the commissioner failed to make the threshold determination required by R.C.5709.12 and 5709.121 as to whether Miracit is a charitable or noncharitable institution. The BTA found that Miracit qualified as a charitable institution; however, the BTA concluded that the property could not be granted exemption under R.C. 5709.121(A)(2) because the evidence did not support a finding that FCI, Too, the institution to whom Miracit leased the property, used the property for a charitable purpose. More particularly, the BTA found at pages 8 and 9 of the decision:
In the present matter, testimony presented at hearing indicated that the day care facility served the neighborhood population, received the majority of its funding from governmental agencies, and charged private-pay parents no more than subsidized parents. However, testimony further indicated that there existed no established criteria as to who qualified as low income. Further, testimony was inconsistent regarding the percentage of low-income families served by the day care facility. * * * [T]he board does not find that the use of a day care is in and of itself a charitable activity. The appellant has not demonstrated that the day care facility in question is "charitable" as that concept has been construed under R.C. 5709.121(A)(2).
 {¶ 17} As previously noted, Miracit contends the BTA erred in denying tax exempt status to the day care facility under R.C. 5709.12 and 5709.121. The BTA found that Miracit was a charitable institution, and that finding has not been challenged; thus, the property belonged to a charitable institution. However, Miracit's brief fails to address the issue upon which the BTA made its determination — whether FCI, Too, the institution to whom Miracit leased the property, used the property for a "charitable purpose" pursuant to R.C. 5709.121(A)(2). Instead, Miracit addresses an issue that was never considered by the BTA — whether Miracit's use of the property was to generate income for Miracit through its commercial lease with FCI, Too. Miracit contends the lease was not intended to generate a profit, did not generate a profit, and was merely a mechanism through which FCI, Too reimbursed Miracit for expenses related to financing the purchase of the day care facility.
 {¶ 18} In support of this argument, Miracit relies on two Ohio Supreme Court cases, Bd. of Educ. of the South-Western City Schools v. Kinnney
(1986), 24 Ohio St.3d 184, and Whitehouse v. Tracy (1995),72 Ohio St.3d 178. In South-Western City Schools, the city of Columbus owned a golf course which included a clubhouse containing, among other things, a snack shop, a pro shop, and an efficiency apartment. The city leased the snack shop to a private concessioner for 22 percent of its gross profits. The course pro was a city employee who was paid a small salary and drew the balance of his income from the sale of pro-shop merchandise. The city rented the efficiency apartment to a non-city employee for $80 per month.
 {¶ 19} The school board challenged the tax-exempt status of the golf course under R.C. 5709.08, which provides, in pertinent part that "public property used exclusively for a public purpose, shall be exempt from taxation." The school board argued that the property was not used exclusively for a public purpose because the snack shop and pro shop were operated to generate a profit for private concerns and the efficiency apartment was operated to the benefit of a private person. Guided by the definition of the term "exclusively" as set forth in R.C. 5709.121(B), the court held that the renting of the efficiency apartment did not violate the "exclusively for a public purpose" requirement of R.C. 5709.08
because the purpose for renting the apartment, that is, to insure that someone would be at the golf course during evening hours to deter vandalism and other damage to the property, was incidental to the course's public purpose and not with a view to profit. The court further held that the operation of the pro shop and snack shop did not violate the "exclusively for a public purpose" requirement of R.C. 5709.08
because nothing in the record suggested that the profit realized by the course pro or concessioner was anything other than trivial and inconsequential. Accordingly, the court concluded that the golf course should retain its tax exempt status.
 {¶ 20} In Whitehouse, the village of Whitehouse owned a water well-field from which it drew water to provide to its residents. The village allowed a local farmer who farmed adjacent land to grow crops on a portion of the well-field. The village and the farmer had no lease or other written contract defining their relationship. The village collected no rent from the farmer, and the farmer was not obligated to share proceeds from his use of the land with the village. It was undisputed that permitting the farmer to plant the well-field saved the village mowing and maintenance expenses on the segments of the field not occupied by the village's operations. It was also undisputed that the farmer earned only a minimal profit from his farming.
 {¶ 21} The village claimed exemption for the entire well-field under R.C. 5709.08. The tax commissioner argued that the property was not used exclusively for a public purpose because a private citizen farmed the property for his own profit. In contrast, the village contended that the farming was an incidental use performed for maintaining the well-field and should not bar exemption.
 {¶ 22} The court recognized the general rule that whenever public property is used by a private citizen for a private purpose, that use generally prevents exemption. However, the court noted that in some situations, a non-public use could be so incidental and de minimis that the use did not defeat an R.C. 5709.08 exemption. The court held that when the private use of land is sufficiently incidental, the land may be characterized as "used exclusively for a public purpose." In so holding, the court cited Southwestern City Schools, supra, for the proposition that when public property is leased to a private individual or concern, the non-public use of the property must be more than incidental before the exclusive public purpose requirement of R.C. 5907.08 will be violated.
 {¶ 23} The court noted that although the record supported a clear inference that the farmer was profiting at least minimally from the use of the land, the record also revealed that the village had effectively retained full control over the use of the property and that the village's assertion that it allowed the farmer to farm part of the well-field solely to save mowing and maintenance expenses was unrefuted. The court concluded that the minimal non-public use of the property was insufficient to defeat the R.C. 5709.08 exemption.
 {¶ 24} Both these cases address whether a private citizen's for-profit use of public property prohibits tax exemption of the property under R.C. 5709.08, the statute granting exemption for government and public property. The instant case does not concern R.C. 5709.08, as neither government nor public property is at issue. Further, to the extent that the cases rely upon the definition of "exclusively" set forth in R.C.5709.121(B), we note that that definition is not applicable to the instant case. As noted by the BTA, R.C. 5709.121(A)(2) is the statute applicable here. Accordingly, Miracit's reliance on South-Western] CitySchools and Whitehouse to support the argument set forth in its brief is misplaced.
 {¶ 25} Although Miracit's brief does not specifically address the BTA's finding that the property was not entitled to exemption under R.C.5709.121(A)(2), counsel for Miracit, pursuant to this court's questioning, addressed the issue at oral argument. As counsel for the tax commissioner addressed the pertinent issue both in her brief and at oral argument, the tax commissioner was not prejudiced by counsel for Miracit's belated argument. Accordingly, we will address whether the BTA's decision was unreasonable or unlawful.
 {¶ 26} As noted previously, under R.C. 5709.121(A)(2), property owned by a charitable institution may be leased to another institution and still qualify for a charitable exemption if the institution leasing the property uses the property for charitable purposes. In its decision, the BTA determined that FCI, Too did not use the property for a charitable purpose because: (1) private pay families were charged no more than subsidized families, (2) there was no established criteria for determining qualification for subsidized funding, and (3) testimony was inconsistent regarding the percentage of low-income families served by the day care center. Further, at oral argument, counsel for the tax commissioner argued that although the center had made arrangements for funding for qualified individuals through Title XX funds, no other plan existed for families to receive reduced rate care if their ability to pay was limited. In other words, there was no evidence of a sliding fee scale to accommodate disparate income levels of those families who did not qualify for Title XX funds.
 {¶ 27} Although the term "charitable purpose" has not been legislatively defined for purposes of determining property tax exemption, the Ohio Supreme Court's definition of "charity" set forth inPlanned Parenthood Assn. v. Tax Commr. (1966), 5 Ohio St.2d 117, paragraph one of the syllabus, has been utilized in numerous property tax exemption cases:
In the absence of a legislative definition, "charity," in the legal sense is the attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity.
See, e.g., Bethesda, supra, at ¶ 32; True Christianity Evangelism,
supra, at 119-120; Case Western Reserve Univ. v. Tracy (1999),84 Ohio St.3d 316, 320; Olmsted Falls Bd. of Educ., supra; Herb Societyof America, Inc. v. Tracy (1994), 71 Ohio St.3d 374, 376.
 {¶ 28} It is against this definition that FCI, Too's use of the property must be measured to determine if it constitutes a charitable purpose.
 {¶ 29} In Bethesda, supra, the applicant sought tax exemption for a property it leased to itself that included a fitness center. The fitness center had 5400 members and made available eight full scholarships to persons who were unable to afford the membership fees. The center also made partial scholarships available, but no evidence was presented as to the number of partial scholarships. The BTA did not exempt the fitness center because it determined that it was being used as a private health facility for the exclusive use of paying members and that such use bore no functional relationship to any charitable purpose of its owner.
 {¶ 30} In reviewing the BTA's decision, the court noted that the first question to be considered was "whether payment for the services received negates the charitable nature of an institution's activities." Bethesda
at ¶ 33. Relying on its previous holding in Planned Parenthood Assn.,
supra, paragraph three of the syllabus, "[t]hat one or more persons receiving the benefits of a charitable institution have the means, in whole or in part, to purchase those benefits in the market place or that some consideration is exacted from them on receipt of the benefits does not detract from the charitable character of the institution," theBethesda court determined that "the mere fact that a charge is made for use of the Fitness Center does not in and of itself negate consideration of the use being a charitable use." Id. at ¶ 35.
 {¶ 31} The court further noted language employed in CollegePreparatory School for Girls of Cincinnati v. Evatt (1945),144 Ohio St. 408, a case involving tax exemption of a school:
* * * [W]here a school is operated to give service to the public generally, and is available to some without charge, the fact that tuition in a substantial amount is paid by others does not destroy the charitable character, so long as it extends charitable benefits to members of the public at large to an extent consistent with the continued operation of the school. It is upon this recognition of its obligation that its charitable character is determined.
Id. at 412, quoting O'Brien v. Physicians' Hospital Ass'n. (1917),96 Ohio St. 1.
 {¶ 32} The court noted, however, that "when charges are made for the services being offered, we must consider the overall operation being conducted to determine whether the property is being used exclusively for charitable purposes." Bethesda at ¶ 35. To that end, the court adopted the following language from Cleveland Osteopathic Hosp. v. Zangerle
(1950), 153 Ohio St. 222, 225-226, an exemption case involving a hospital:
It seems obvious that no single test is dispositive of whether a hospital, for example, is being conducted exclusively as a charitable project. All the facts in each individual case must be assembled and examined in their entirety and the substance of the scheme or plan of operation exhibited thereby will determine whether the institution involved is entitled to have its property freed from taxes.
(Emphasis sic.)
 {¶ 33} Upon examination of the facts in the case before it, theBethesda court noted that only eight full scholarships and an unknown number of partial scholarships were given to persons who could not otherwise afford the membership fees for the fitness center, and that the number of full scholarships given amounted to only one tenth of one percent of the total membership. The court determined that the small number of members able to use the fitness center without payment of membership did not indicate a charitable use. However, in so finding, the court stated that "[w]hether an institution renders sufficient services to persons who are unable to afford them to be considered as making charitable use of property must be determined on the totality of the circumstances; there is no absolute percentage." Id. at ¶ 39.
 {¶ 34} In the instant case, we recognize that operation of a day care center does not define whether the property is being put to a charitable use. However, in this case, the day care center was established to further Miracit's objective of revitalizing an economically depressed neighborhood in Columbus' inner city and assisting the economically disadvantaged residents of that neighborhood. Under Bethesda, the fact that FCI, Too charges Title XX families and private pay families the same tuition and does not offer a sliding fee scale to accommodate disparate income levels of those families who do not qualify for Title XX funds is of no consequence. Further, in contrast to Bethesda, evidence presented at the hearing establishes that a large percentage, between 50 and 75 percent, of those utilizing the day care center are Title XX qualified families.
 {¶ 35} Since Miracit's real property is used in a consonant manner under applicable controlling criteria regarding charitable purposes, such property qualifies for tax exemption status under R.C. 5709.121(A)(2). Thus, we conclude that the BTA's decision denying Miracit's property tax exempt status is unreasonable. Accordingly, Miracit's assignments of error are sustained. The decision is reversed and the case is remanded to the Board of Tax Appeals for further proceedings consistent with this opinion.
Judgment reversed and remanded.
Sadler and French, JJ., concur.