BETHESDA HEALTHCARE, INC., APPELLANT, v. WILKINS, TAX COMMR., APPELLEE.

[Cite as *Bethesda Healthcare, Inc. v. Wilkins,*
101 Ohio St.3d 420, 2004-Ohio-1749.]

(No. 2002–1799—Submitted February 3, 2004—Decided April 21, 2004.)

**Per Curiam.**

{¶ 1} Bethesda Healthcare, Inc. ("Bethesda") seeks real property tax exemption for tax year 1998 and remission of taxes, interest, and penalties for tax year 1997 for real property owned by it in Montgomery, Hamilton County. The property, which is located about one mile from Bethesda North Hospital, consists of a 9.669–acre tract along with a 110,477–square–foot three-story building, which is known as the TriHealth Fitness and Health Pavilion ("Pavilion").

{¶ 2} Bethesda is an Ohio nonprofit corporation that is recognized by the Internal Revenue Service as a 501(c)(3) organization. The specific purposes of Bethesda, as set forth in its articles of incorporation, are (1) "[t]o benefit and carry out the purposes of Bethesda Hospital, Inc., through the provision of ambulatory care and other health care services" and (2) "[t]o engage in any and all activities consistent with or in furtherance of the above purposes."

{¶ 3} Bethesda Healthcare, Inc. leases 73,682 square feet of the first and second floors of the Pavilion to itself for accounting purposes. Bethesda seeks exemption for this space in the Pavilion, which is referred to as the Fitness Center, plus some additional areas outside the Pavilion.

{¶ 4} Another portion of the Pavilion (7,140 square feet) is leased to private physicians and practice groups. No exemption has been sought for that portion of the property.

{¶ 5} Other areas in the Pavilion are leased to departments of Bethesda Hospital, Inc., such as physical therapy (14,719 square feet), cardiac rehabilitation (5,122 square feet), and hand rehabilitation (2,696 square feet). In addition, Good Samaritan Hospital leases space (2,203 square feet) for its Healing Arts Center.

The amount of square footage (24,740) charged to these hospitals is the total of the square footage that is used solely by them, plus a percentage of certain facilities that they use that are located in the Fitness Center. For instance, 50 percent of the warm-water pool, which is located in the Fitness Center, is allocated to physical therapy. The 24,740 square feet used by these hospitals has been exempted from real property taxation. Persons using these rehabilitation facilities are billed by the hospitals.

{¶ 6} After examination of Bethesda's application for exemption, the Tax Commissioner granted real property tax exemption to the 24,740 square feet leased to the Bethesda Hospital, Inc. and Good Samaritan Hospital described above, along with 50 parking spaces.

{¶ 7} As a result of his decision, which exempted only a portion of the property, the Tax Commissioner declared that the property should be split-listed pursuant to R.C. 5713.04.

{¶ 8} Bethesda appealed from the Tax Commissioner's final determination to the Board of Tax Appeals ("BTA"). After a hearing at which Bethesda presented testimony and evidence, the BTA granted tax exemption to an outdoor running track that was available for use by the public. However, the BTA did not exempt the Fitness Center, because it found that it was being used as a private health facility for the exclusive use of paying members and that such use bore no functional relationship to any charitable purpose of its owner.

{¶ 9} The Fitness Center, which advertises itself on its Internet website as "Cincinnati's premier fitness center," contains a multitude of state-of-the-art exercise facilities. On the second floor of the Pavilion there are two tracks, a one-eighth-mile two-lane running track and a one-sixteenth-mile walking path, a free-weight area, machine weights, and a group-exercise area along with some closed small studio rooms. Fifty percent of the walking path was exempted based upon use by cardiac rehabilitation.

{¶ 10} On the first floor there is a warm-water-therapy pool, half of which has been exempted based on its use by Bethesda Hospital's physical therapy unit. Also on the first floor is a six-lane lap pool. Adjacent to the pools are changing rooms, an outdoor concession stand, and a lifeguard office. There are also private dressing rooms and a hallway of family changing rooms. In addition, there are areas for whirlpools, steam, and sauna. A sports arena that can be used either as a collegiate basketball court or as three volleyball courts is also located on the first floor. Located in one corner of the first floor are a nursery, a children's activity center, and a children's gym. The first floor also contains another exercise studio similar to the one on the second floor. The conference room located on the first floor will seat about 120 people. The teaching kitchen is used to teach people how to cook healthful foods. Adjacent to the kitchen is the

café. The day spa occupies four rooms and massage areas in the middle of the locker rooms. Services such as facials, manicures, and pedicures are offered to members and nonmembers at the day spa. Finally, there is a shop on the first floor that sells clothing, including T-shirts and bathing suits.

{¶ 11} Outside the Pavilion building is another swimming pool, a sand volleyball court, and a basketball court.

{¶ 12} To use the Fitness Center's facilities, other than the outdoor track, a person must be either a guest or a member. The Fitness Center has 5,400 members in various categories. Use of the rehabilitation areas is not included in a Fitness Center membership. After a person has completed physical, occupational, or cardiac rehabilitation, he or she can obtain a three-month postrehab membership at the Fitness Center for $220. After the three-month postrehab membership expires, the person must convert to a regular membership in order to continue use of the Fitness Center. About 50 people are involved in the postrehab program. The initiation fee for a single membership is $240, with a monthly fee of $64. The monthly fee for persons over age 65 is $53. Corporate memberships are available at a reduced amount when more than ten employees of a corporation are members. Reduced membership fees are also available for employees of TriHealth. TriHealth, the operator of the Fitness Center, is a 501(c)(3) charitable organization formed by Bethesda Hospital and Good Samaritan Hospital. Children under age 13 have a membership rate of $23 per month. Children are limited to two hours per visit, and a parent must be on the premises.

{¶ 13} Before the Fitness Center opened, a consultant was hired to determine the viability of the project. The consultant looked at other fitness facilities and their fee structures. The fees charged by the Fitness Center were based on affordability and a fair market value for the service. The Fitness Center, which opened in January 1997, made no profit in its early years. However, in 2000, revenue exceeded direct expenses.

{¶ 14} When members over age 14 come in they must fill out a health profile. If there are multiple risk factors, the applicant must obtain a form filled out by a physician or submit a waiver of medical consultation, in which case they are ineligible for some services.

{¶ 15} The Fitness Center made available eight scholarships to persons who were unable to afford the fees. In addition, the Fitness Center also made partial scholarships available; however, it presented no evidence of the number of partial scholarships.

{¶ 16} The Fitness Center does make some of its facilities available to the public. For instance, the warm-water-therapy pool is made available to the Arthritis Foundation. In addition, the Fitness Center participates in such activities as free cholesterol screenings. At times there is a charge made to

cover costs when facilities are made available for community programs. Participation in basketball and volleyball leagues costs extra, and an additional fee is imposed for any nonmembers on a team.

{¶ 17} This cause is now before the court upon an appeal as of right.

{¶ 18} In reviewing decisions of the BTA, "this court has repeatedly stated that it is not a trier of fact *de novo,* but that it is confined to its statutorily delineated duties (R.C. 5717.04) of determining whether the board's decision is 'reasonable and lawful.'" *Episcopal Parish of Christ Church, Glendale v. Kinney* (1979), 58 Ohio St.2d 199, 201, 12 O.O.3d 197, 389 N.E.2d 847. It is not the function of this court to substitute its judgment for that of the BTA on factual issues. However, facts determined by the BTA must be supported by sufficient probative evidence. *Hawthorn Mellody, Inc. v. Lindley* (1981), 65 Ohio St.2d 47, 19 O.O.3d 234, 417 N.E.2d 1257, syllabus.

{¶ 19} In *Cincinnati College v. State* (1850), 19 Ohio 110, 115, 1850 WL 68, we stated that "all laws that exempt any of the property of the community from taxation should receive a strict construction. All such laws are in derogation of equal rights." The court pointed out, "If property, employed in one kind of business, is exempted from taxation, the burden will necessarily fall more heavily on property employed in other pursuits." When an exemption is granted by the General Assembly, "[t]he rationale justifying a tax exemption is that there is a present benefit to the general public from the operation of the charitable institution sufficient to justify the loss of tax revenue." *White Cross Hosp. Assn. v. Bd. of Tax Appeals* (1974), 38 Ohio St.2d 199, 201, 67 O.O.2d 224, 311 N.E.2d 862. Statutes providing exemption from taxation must be strictly construed. *Natl. Tube Co. v. Glander* (1952), 157 Ohio St. 407, 47 O.O. 313, 105 N.E.2d 648, paragraph two of the syllabus. The burden rests on the party claiming an exemption to demonstrate that the property qualifies for the exemption. *OCLC Online Computer Library Ctr. Inc. v. Kinney* (1984), 11 Ohio St.3d 198, 201, 11 OBR 509, 464 N.E.2d 572.

{¶ 20} The authority for the General Assembly to exempt property is set forth in Section 2, Article XII of the Ohio Constitution, which provides, "Without limiting the general power, subject to the provisions of Article I of this constitution, to determine the subjects and methods of taxation or exemptions therefrom, general laws may be passed to exempt * * * institutions used exclusively for charitable purposes * * *."

{¶ 21} The statutes adopted by the General Assembly upon which Bethesda relies for its claim of exemption are R.C. 5709.12(B) and 5709.121. R.C. 5709.12(B) provides, "Real * * * property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation * * *." R.C. 5709.121, while not itself granting an exemption, provides, "Real property * * *

belonging to a charitable * * * institution * * * shall be considered as used exclusively for charitable * * * purposes by such institution * * * if it meets one of the following requirements:

{¶ 22} "(A) It is used by such institution * * * under a lease, sublease, or other contractual arrangement:

{¶ 23} "(1) As a community or area center in which presentations in music, dramatics, the arts, and related fields are made in order to foster public interest and education therein;

{¶ 24} "(2) For other charitable * * * purposes;

{¶ 25} "(B) It is made available under the direction or control of such institution * * * for use in furtherance of or incidental to its charitable * * * purposes and not with the view to profit."

{¶ 26} The relationship between R.C. 5709.12 and 5709.121 was explained in *Episcopal Parish,* 58 Ohio St.2d at 200–201, 12 O.O.3d 197, 389 N.E.2d 847, wherein we approved the concurring opinion of Justice Stern in *White Cross Hosp. Assn.,* 38 Ohio St.2d at 203, 67 O.O.2d 224, 311 N.E.2d 862:

{¶ 27} "Initially, it is important to observe that, although R.C. 5709.121 purports to define the words used exclusively for 'charitable' or 'public' purposes, as those words are used in R.C. 5709.12, the definition is not all-encompassing. R.C. 5709.12 states: '* * * Real and tangible personal property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation.' Thus *any* institution, irrespective of its charitable or noncharitable character, may take advantage of a tax exemption if it is making exclusive charitable use of its property. See *Wehrle Foundation v. Evatt* (1943), 141 Ohio St. 467, 49 N.E.2d 52. The legislative definition of exclusive charitable use found in R.C. 5709.121, however, applies only to property 'belonging to,' *i.e., owned by,* a charitable or educational institution, or the state or a political subdivision. The net effect of this is that R.C. 5709.121 has no application to noncharitable institutions seeking tax exemption under R.C. 5709.12. Hence, the first inquiry must be directed to the nature of the institution applying for an exemption."

{¶ 28} "Thus, in deciding whether property is exempt under the charitable use provisions of R.C. 5709.12 and R.C. 5709.121, tax authorities must first determine whether the institution seeking exemption is a charitable or noncharitable institution. * * * If the institution is charitable, its property may be exempt if it uses the property exclusively for charitable purposes or it uses the property under the terms set forth in R.C. 5709.121." *Olmsted Falls Bd. of Edn. v. Tracy* (1997), 77 Ohio St.3d 393, 396, 674 N.E.2d 690.

{¶ 29} Thus, the nature of an institution seeking exemption under R.C. 5709.12(B) without regard to R.C. 5709.121 is not relevant. However, the

application of R.C. 5709.121 is limited to charitable or educational institutions or to the state or a political subdivision.

{¶ 30} Bethesda is an Ohio nonprofit corporation, recognized by the Internal Revenue Service as a 501(c)(3) organization. No question has been raised in this case as to Bethesda's status as a charitable institution.

{¶ 31} The term "charitable purposes" is not defined for property-tax-exemption purposes; however, this court has defined "charity":

{¶ 32} "In the absence of a legislative definition, 'charity,' in the legal sense, is the attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity." *Planned Parenthood Assn. v. Tax Commr.* (1966), 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the syllabus.

{¶ 33} The first question we need to consider under the facts of this case is a question which we addressed in *Planned Parenthood Assn.*, and that is whether payment for the services received negates the charitable nature of an institution's activities. The court answered that question as follows:

{¶ 34} "That one or more persons receiving the benefits of a charitable institution have the means, in whole or in part, to purchase those benefits in the market place or that some consideration is exacted from them on receipt of the benefits does not detract from the charitable character of the institution." Id. at paragraph three of the syllabus.

{¶ 35} Thus, the mere fact that a charge is made for use of the Fitness Center does not in and of itself negate consideration of the use being a charitable use. However, when charges are made for the services being offered, we must consider the overall operation being conducted to determine whether the property is being used exclusively for charitable purposes.

{¶ 36} While members of the Fitness Center may receive more attention, by better-trained instructors, and receive services that are not available at other fitness centers, these facts do not make the use of the property by the Fitness Center a charitable one. The mere operation of a fitness center does not define whether the property is being put to a charitable use.

{¶ 37} In an exemption case involving a hospital, former Justice Zimmerman stated in *Cleveland Osteopathic Hosp. v. Zangerle* (1950), 153 Ohio St. 222, 225–226, 41 O.O. 243, 91 N.E.2d 261: "It seems obvious that no single test is dispositive of whether a hospital, for example, is being conducted *exclusively* as a charitable project. All the facts in each individual case must be assembled and

examined in their entirety and the substance of the scheme or plan of operation exhibited thereby will determine whether the institution involved is entitled to have its property freed from taxes."

{¶ 38} Similarly, in this case, when we look at all the facts, we find that only eight full scholarships and an unknown number of partial memberships were given to persons who could not otherwise afford the membership fees. Eight scholarships out of 5,400 members amounts to only slightly over one tenth of one percent of the total members. In *College Preparatory School for Girls of Cincinnati v. Evatt* (1945), 144 Ohio St. 408, 413, 29 O.O. 574, 59 N.E.2d 142, the court stated, "The maintenance of a school for the benefit of the public is a charity. *Gerke, Treas., v. Purcell* [ (1874), 25 Ohio St. 229, 1874 WL 58]. If the school is essentially a private institution, no such benefit is conferred. But where a school is operated to give service to the public generally, and is available to some without charge, the fact that tuition in a substantial amount is paid by others does not destroy the charitable character, so long as it extends charitable benefits to members of the public at large to an extent consistent with the continued operation of the school. It is upon this recognition of its obligation that its charitable character is determined. *O'Brien, Treas., v. Physicians' Hospital Ass'n.* 96 Ohio St. 1, 116 N.E. 975, L.R.A. 1917F, 741."

{¶ 39} Whether an institution renders sufficient services to persons who are unable to afford them to be considered as making charitable use of property must be determined on the totality of the circumstances; there is no absolute percentage. Here the small number of members able to use the Fitness Center without payment of membership dues does not indicate a charitable use under the facts of this case. Therefore, we find that the decision of the BTA was reasonable and lawful and affirm it.

Decision affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

Vorys, Sater, Seymour & Pease, L.L.P., Raymond D. Anderson, Carol Mahaffey and Mary C. Henkel, for appellant.

Jim Petro, Attorney General, and James C. Sauer, Assistant Attorney General, for appellee.