DIALYSIS CLINIC, INC., APPELLANT, *v.* LEVIN, TAX COMMR., APPELLEE.

[Cite as *Dialysis Clinic, Inc. v. Levin*, 127 Ohio St.3d 215, 2010-Ohio-5071.]

*Taxation — Charitable-use exemption of real property from taxation — R.C.*
*5709.12 — R.C. 5709.121 — Board of Tax Appeals' denial of claim for*
*charitable-use exemption was reasonable and lawful.*

(No. 2009-2310 — Submitted August 10, 2010 — Decided October 26, 2010.)

APPEAL from the Board of Tax Appeals, No. 2006-V-2389.

_____

LANZINGER, J.

**{¶ 1}** This is an appeal from a decision of the Board of Tax Appeals
("BTA") in a case involving an application for a tax exemption for real property.
Appellant, Dialysis Clinic, Inc. ("DCI"), provides dialysis services for patients
who suffer from end-stage renal disease ("ESRD"). DCI sought to obtain a
charitable-use exemption for its West Chester facility in Butler County, but the
Tax Commissioner denied the application. On appeal, the BTA affirmed the
denial of the exemption, finding that DCI had not shown that it qualified as a
charitable institution for purposes of R.C. 5709.121 or that the use of the West
Chester facility's real property was exclusively charitable, pursuant to R.C.
5709.12(B).

**{¶ 2}** Based on our review of the case law and the record of this case,
and concluding that the BTA's decision is reasonable and lawful, we affirm.

## I. Facts

**{¶ 3}** DCI was organized as a nonprofit corporation in Tennessee in
1971. DCI's charter specifically states that DCI's purpose is to operate dialysis
clinics and to receive and apply funds to purposes recognized under Section

501(c)(3) of the Internal Revenue Code; as amended, the charter explicitly prohibits operating for "pecuniary gain or profit."[1]

{¶ 4} On December 22, 2003, DCI filed an application for a property-tax exemption for tax year 2004 for its West Chester facility, a 9,846-square-foot building located at 7650 University Drive in Butler County, at which DCI provides dialysis services to ESRD patients. In the application, DCI stated that fees for services "are billed to Medicare, Medicaid or insurance companies and patients with ability to pay. Patients unable to pay for services are not turned away." The application did not identify the statutory sections under which exemption was sought, but the commissioner reviewed the application as a claim for charitable-use exemption under R.C. 5709.12(B) and 5709.121.

{¶ 5} DCI is certified by the IRS as a Section 501(c)(3) tax-exempt entity. DCI's federal tax filings showed an excess of revenues over expenses of $6,306,492 in 2003 and $32,167,517 in 2004. As of October 2006, DCI operated 195 outpatient dialysis clinics in 26 states and devoted a good deal of its net income to promoting kidney research. In addition to the West Chester clinic, DCI also has Ohio clinics in the Walnut Hills, Western Hills, and Mt. Healthy areas in Cincinnati, in Portsmouth, and in East Liverpool. Although some DCI facilities generate net income (as does the company as a whole), the West Chester facility was not one of them: until the August 2008 BTA hearing, the West Chester facility had suffered an average net loss of $250,000 per year.

{¶ 6} Medicare covers the cost of dialysis for persons with ESRD without regard to income. According to testimony at the BTA hearing, Medicare initially pays 80 percent of the cost of services, with 20 percent remaining the patient's responsibility. Patients who qualify for Medicare but who cannot pay the copayment may also qualify for Medicaid, which would then pay the

---

1. In its brief, DCI states that its "charter prohibits it from turning away patients that cannot pay," but the charter makes no such express commitment.

copayment. Low-income patients who do not qualify for Medicare may qualify for Medicaid benefits. DCI accepts both Medicare and Medicaid patients. Medicare regulations prohibit a clinic from providing services at a lower fee to non-Medicare patients than to Medicare patients. As a result, DCI's clinics must seek payment from all patients and otherwise follow Medicare and Medicaid requirements.

{¶ 7} DCI stated that 62 percent of its patients at the West Chester facility are Medicare patients, and nine percent are covered by Medicaid. For many Medicare and Medicaid patients, if the patient is indigent, DCI writes off the portion that the patient is obligated to pay. DCI stated that it did provide "charity care" for persons who are ineligible for or are waiting to qualify for Medicare or Medicaid, but it did not quantify such aid.

{¶ 8} DCI's administrator for the Cincinnati area testified before the BTA that 65 to 75 percent of DCI patients in that area are Medicare patients. At the West Chester facility, 60 to 65 percent on any given day are Medicare patients, and 10 percent are Medicaid-only patients. Approximately 15 percent of DCI's patients in the area are privately insured. Medicare is DCI's primary revenue source.

{¶ 9} DCI applied half its excess revenue to support kidney research and half to subsidize its own services – which included covering unpaid costs of providing care, opening new clinics, and operating a children's summer camp free of charge to children who suffer from ESRD or who have received kidney transplants. DCI's donations to research at the University of Cincinnati from 2004 to the 2008 hearing exceeded $1.7 million.

{¶ 10} DCI developed a policy to comply with Medicare regulations regarding care to indigent patients. Medicare prohibits providers from charging favorable rates to non-Medicare patients (so as to prohibit a sliding scale of fees). But Medicare will reimburse a provider for unpaid deductibles or coinsurance

under certain circumstances. Patients in financial need are asked to fill out the Financial Analysis Form ("FAF") within ten days of admission to treatment. Even private-pay patients may submit the form, which allows DCI to ascertain whether to pursue collection of an unpaid bill or write off amounts as uncollectible pursuant to Medicare guidelines. At some Cincinnati-area facilities, DCI had patients who had no outside payment source (or who had failed to properly apply for government benefits), but there had never been any such patients at the West Chester facility.

{¶ 11} DCI receives its patients through hospital referrals. A social worker assists patients to assure that all sources of payment are tapped, but if a patient is referred "with no means to pay," DCI "do[es] not turn them away." In response to the question "Do you provide service without regard to a patient's ability to pay at your facilities?" the answer was "That's true." DCI's indigency policy, however, expressly states that the *"indigence policy is not a charity or gift to patients. DCI retains all rights to refuse to admit and treat a patient who has no ability to pay."* (Emphasis added.)

{¶ 12} In his final determination, the Tax Commissioner denied the exemption, stating that neither DCI's acceptance of reimbursement from Medicare and Medicaid nor its write-off of bad debt constituted a charitable act.

{¶ 13} On appeal, the BTA determined that DCI's West Chester clinic did not qualify for exemption under R.C. 5709.12(B) because, "[a]s DCI concedes, it provides no free or charitable service at the subject property." *Dialysis Clinic, Inc. v. Wilkins* (Nov. 24, 2009), BTA No. 2006-V-2389, 2009 WL 4100065, *6. The BTA also concluded that DCI could not qualify under R.C. 5709.121 because DCI was not a "charitable institution." Id. The BTA relied heavily on the indigency policy's statement that no gift of service is intended and that DCI reserves the right to refuse treatment based on inability to pay. Id. at *7. The BTA could discern no distinction between DCI and for-profit dialysis clinics apart

from the DCI's use of its excess revenue.  Id.  As for DCI's contributions to kidney research, the BTA held that DCI could not claim charitable status vicariously based on the charitable nature of those to whom it contributed.  Id.

{¶ 14} Finally, the BTA agreed with the commissioner that the record showed no unreimbursed free or charity care at the West Chester clinic.  Because DCI did not present a charity-care figure, the BTA attempted to construe one from the record.  As a nationwide charity-care figure for all DCI facilities, the BTA used the Medicare "bad-debt charity write-off" figure for October 2006 through September 2007:  that write-off amounted to under $6.7 million, which was 1.27 percent of $526,891,082 in charges generated for that period.  Id. at *8.  Although the BTA also gave reasons for not regarding the write-off as charitable care, the BTA stated that if the percentage that was written off were viewed as charity care, it would be "insufficient to meet the charitable service standards required for exemption."  Id.

{¶ 15} DCI has appealed, and we affirm the BTA's decision.

## II. Analysis

{¶ 16} This appeal questions the BTA's interpretation of the charitable-purpose exemption.  Under R.C. 5709.12(B), "[r]eal and tangible personal property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation."  Furthermore, under R.C. 5709.121(A), "[r]eal property and tangible personal property belonging to a charitable or educational institution * * * shall be considered as used exclusively for charitable * * * purposes by such institution * * * if it meets" one of the specified requirements under that statute.

{¶ 17} DCI seeks exemption primarily under R.C. 5709.121(A)(2). "To fall within the terms of R.C. 5709.121, property must (1) be under the direction or control of a charitable institution * * *, (2) be otherwise made available 'for use in furtherance of or incidental to' the institution's 'charitable * * * purposes,' and

(3) not be made available with a view to profit." *Cincinnati Nature Ctr. Assn. v. Bd. of Tax Appeals* (1976), 48 Ohio St.2d 122, 125, 2 O.O.3d 275, 357 N.E.2d 381, quoting R.C. 5709.121(A)(2). We hold that the BTA acted reasonably and lawfully in determining that DCI does not qualify as a "charitable institution."

*A. Property does not qualify for exemption under R.C. 5709.121 simply because it is owned by, and used to further purposes of, an entity that enjoys exempt status under Section 501(c)(3) of the Internal Revenue Code*

{¶ 18} When a BTA decision is appealed, this court looks to see if the decision was "reasonable and lawful." *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14. This means that " '[t]he BTA is responsible for determining factual issues and, if the record contains reliable and probative support for these BTA determinations,' " we will affirm. Id., quoting *Am. Natl. Can Co. v. Tracy* (1995), 72 Ohio St.3d 150, 152, 648 N.E.2d 483. On the other hand, we " 'will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.' " Id., quoting *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino* (2001), 93 Ohio St.3d 231, 232, 754 N.E.2d 789.

{¶ 19} DCI contends that because "the provision of nonprofit medical care is charitable," it should be recognized as a "charitable institution" for purposes of R.C. 5709.121. Amicus curiae Ohio Hospital Association ("OHA") further explains DCI's legal argument. OHA refers to R.C. 5709.12(B) and 5709.121 as "two independent property-tax exemptions for charitable property." According to OHA, R.C. 5709.12(B) "focuses on the specific use of the property," while R.C. 5709.121 conditions exemption "not [on] the uses of the property, but [on] the general activities and purposes of the owner." OHA argues that R.C. 5709.121 affords an exemption "[s]o long as an institution is charitable or educational," and to qualify for that exemption, "its property only need be *used incidentally* to charitable or educational purposes." (Emphasis sic.)

{¶ 20} But this interpretation significantly expands the scope of the property-tax exemption for facilities that provide healthcare services. DCI focuses on the "high bar" set by the IRS in qualifying institutions for tax-exempt status pursuant to Section 501(c)(3) of the Internal Revenue Code, arguing that the federal status by itself "militates heavily in favor of finding it to be a 'charitable institution.' " OHA is more explicit: "If an institution with a charitable or educational purpose qualifies as a Section 501(c)(3) entity (exempt from taxation under Section 501(a)), it likewise should qualify as charitable or educational under R.C. 5709.121(A)." In other words, a Section 501(c)(3) nonprofit corporation should also be characterized as a "charitable institution" under Ohio law.

{¶ 21} This expansive construction of R.C. 5709.121 is inconsistent with the legislative purpose behind its enactment and with ordinary principles of statutory construction for three reasons.

{¶ 22} First, R.C. 5709.121 constitutes a refinement of R.C. 5709.12(B). R.C. 5709.121 does not declare any property to be exempt but links certain property uses to R.C. 5709.12(B)'s exclusive-charitable-use exemption. Special treatment under R.C. 5709.121 depends on the owner's qualifying as a "charitable or educational" institution.

{¶ 23} Second, R.C. 5709.121 was enacted to address a restriction on the availability of exemption under R.C. 5709.12(B). Historically, the exemption for charitable use had not been permitted when the owner had leased the property to another, even if that lessee was using the property for charitable purposes. *First Baptist Church of Milford v. Wilkins*, 110 Ohio St.3d 496, 2006-Ohio-4966, 854 N.E.2d 494, ¶ 12, quoting *Zangerle v. State ex rel. Gallagher* (1929), 120 Ohio St. 139, 145, 165 N.E.709 (Day, J., concurring) (" 'ownership and use for charitable purposes must coincide' "); *Lincoln Mem. Hosp., Inc. v. Warren* (1968), 13 Ohio St.2d 109, 110, 42 O.O.2d 327, 235 N.E.2d 129 (exemption was

unavailable because the use of the property as a hospital was not the owner's use); *Northeast Ohio Psych. Inst. v. Levin*, 121 Ohio St.3d 292, 2009-Ohio-583, 903 N.E.2d 1188, ¶ 11 (under R.C. 5709.12(B), "it is the owner's use of the property, not a lessee's use, that determines whether the property should be exempted." [Emphasis omitted]).

**{¶ 24}** Under R.C. 5709.121, when the owner qualifies as a charitable institution, property used exclusively for charitable purposes[2] is exempt if the property is (i) leased to another charitable institution and used for charitable purposes, R.C. 5709.121(A)(1)(b), or (ii) made available under the control of the owner for use in furtherance of the owner's charitable purposes, R.C. 5709.121(A)(2). This limited expansion of the charitable-use exemption granted by R.C. 5709.12(B) constitutes the central purpose behind R.C. 5709.121's enactment. See *First Baptist Church of Milford* at ¶ 16, quoting *White Cross Hosp. Assn. v. Bd. of Tax Appeals* (1974), 38 Ohio St.2d 199, 203, 67 O.O.2d 224, 311 N.E.2d 862 (Stern, J., concurring) (" 'the overall purpose of R.C. 5709.121 is to declare that the ownership and use of property need not coincide for that property to be tax exempt' "). Although R.C. 5709.121 does expand the scope of the charitable-use exemption, this expansion has a narrower purpose than that which DCI and OHA advance.[3] We have stated that "R.C. 5709.121 does not itself grant any exemption. It merely sets forth certain situations in which real and personal property belonging to charitable or educational institutions * * * may be considered as used exclusively for charitable * * * purposes." *First Baptist Church of Milford* at ¶ 16; Am.Sub.H.B. No. 817, 133 Ohio Laws, Part

2. The charitable-use exemption that R.C. 5709.121 specifically extends to certain performing arts centers and other types of use is not at issue in this case.

3. The Legislative Service Commission's Final Bill Analysis of Am.Sub.H.B. No. 817, 133 Ohio Laws, Part III, 2646, refers to the exemption at R.C. 5709.12(B) and states that R.C. 5709.121 "expands the present tax exemption" to encompass property "under a lease or contract with the owner," providing relief from the rule that "the ownership of the property and its use must coincide."

III, 2646 (title of the bill enacting R.C. 5709.121 states that its purpose is to "*clarify* the exemption from taxation of property belonging to a charitable institution." [Emphasis added]).

{¶ 25} Third, DCI's argument would conflate Ohio's property-tax exemption with standards under federal law for tax-exempt charities. We have already rejected that contention, stating that "tying charitable use so tightly to Congress's policy goals is wrong because Congress does not define the scope of charitable use under Ohio law." *NBC-USA Hous., Inc.-Five v. Levin*, 125 Ohio St.3d 394, 2010-Ohio-1553, 928 N.E.2d 715, ¶ 20.

{¶ 26} Our case law has predicated entitlement to the charitable-use exemption on services being provided "on a nonprofit basis to those in need, *without regard to race, creed, or ability to pay*." (Emphasis added.) *Church of God in N. Ohio, Inc. v. Levin*, 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, ¶ 19, citing *Vick v. Cleveland Mem. Med. Found.* (1965), 2 Ohio St.2d 30, 31 O.O.2d 16, 206 N.E.2d 2, paragraph two of the syllabus. In contrast, federal tax law affords a charitable exemption on a less restrictive basis. See Rev.Rul. 69-545, 1969-2 C.B 117; Rev.Rul. 83-157, 1983-2 C.B. 94; M. Hall & J. Colombo, The Charitable Status of Nonprofit Hospitals: Toward a Donative Theory of Tax Exemption (1991), 66 Wash.L.Rev. 307, 320-321 (in Rev.Rul. 69-545, the IRS "abandoned the charity care requirement" and "adopted a 'per se' rule" that "an entity engaged in the 'promotion of health' for the general benefit of the community is pursuing a charitable purpose, *even though a portion of the community, such as indigents, are* [sic] *excluded from participation*." [Emphasis added]). We reject a reading of R.C. 5709.121 that essentially substitutes more lenient federal-law standards for the well-developed Ohio law of charitable use.

*B. An institution is "charitable" under R.C. 5709.121 only if its core activities qualify as charity under the standards for determining the charitable use of property pursuant to R.C. 5709.12(B)*

**{¶ 27}** We have held that the determination of an owner's status as a "charitable institution" under R.C. 5709.121 requires a review of the "charitable activities of the taxpayer seeking the exemption." *OCLC Online Computer Library Ctr., Inc. v. Kinney* (1984), 11 Ohio St.3d 198, 201, 11 OBR 509, 464 N.E.2d 572; see also *Northeast Ohio Psych. Inst.*, 121 Ohio St.3d 292, 2009-Ohio-583, 903 N.E.2d 1188, ¶ 14. Activities have been deemed charitable if they accord with the standard of charity that we have developed when determining the charitable use of property directly under R.C. 5709.12(B).

**{¶ 28}** In *Northeast Ohio Psych. Inst.*, a nonprofit entity leased property to another entity that furnished allegedly charitable psychiatric services to the general public. The property's owner and lessor sought a tax exemption, claiming that it could qualify as a charitable institution under R.C. 5709.121. Although the property owner qualified as a charitable entity under Section 501(c)(3) of the Internal Revenue Code, we did not view that status as determinative. Instead, we reviewed the evidence to determine whether the character of the owner's activities was charitable. We noted that in addition to leasing part of the building in question to the psychiatric-services provider, the owner leased the remainder of the building to other tenants, thereby generating significant revenue. *Northeast Ohio Psych. Inst.* at ¶ 8, 9. The owner also furnished psychiatric-staffing services at other locations, which constituted another source of substantial revenue. Id. at ¶ 15. The exemption was denied.

**{¶ 29}** Similarly, in *OCLC*, 11 Ohio St.3d 198, 11 OBR 509, 464 N.E.2d 572, we rejected a claim that a nonprofit corporation that furnished services to libraries for a fee that exceeded their cost could qualify as a charitable institution for purposes of R.C. 5709.121. We noted that the owner was essentially advancing a claim of vicarious exemption: it sought to exempt its own property because it provided services to libraries, which in turn were charitable institutions. Id. at 200. The owner's activities, however, "more closely resemble[d] those of a

publisher of library materials or a data base firm specializing in information retrieval." Id. at 201. The owner also "engage[d] in fee paying research projects for the private gain of commercial enterprises," an endeavor that "preclude[d] the issuance of a charitable tax exemption." Id.

{¶ 30} Because DCI's core activity involves the provision of a healthcare service, DCI would qualify as a "charitable institution" under R.C. 5709.121 only if it provided service "on a nonprofit basis to those in need, without regard to race, creed, or ability to pay." *Church of God in N. Ohio*, 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, ¶ 19, citing *Vick*, 2 Ohio St.2d 30, 31 O.O.2d 16, 206 N.E.2d 2, paragraph two of the syllabus. Applying this standard, we must determine whether the BTA acted reasonably and lawfully when it found that DCI did not qualify as a charitable institution.

### *C. The BTA acted reasonably and lawfully in determining that DCI is not a charitable institution*

{¶ 31} In finding that DCI did not qualify as a "charitable institution" for purposes of R.C. 5709.121, the BTA addressed three principal factors.

{¶ 32} First, the BTA found that DCI charged all patients at the West Chester site – and most patients at its other facilities – for the services it provides. The BTA echoed the commissioner's position that the provision of free, unreimbursed care constitutes an essential part of a tax-exemption claim for a healthcare-services provider. But to the extent that the BTA thought that DCI had to provide some threshold level of unreimbursed care, we disagree, as will be discussed.

{¶ 33} Second, the BTA found that DCI could not base its claim on the donation of surplus revenue to kidney research, because such a claim would constitute the type of "vicarious exemption" that we rejected in *OCLC*, 11 Ohio St.3d 198, 11 OBR 509, 464 N.E.2d 572. The BTA is correct. DCI may not establish its own core activity as charitable by pointing to a benefit that it confers

upon another entity whose activity is charitable.[4] "It is only the use of property in charitable pursuits that qualifies for tax exemption, not the utilization of receipts or proceeds that does so." *Hubbard Press v. Tracy* (1993), 67 Ohio St.3d 564, 566, 621 N.E.2d 396 ; *Wehrle Found. v. Evatt* (1943), 141 Ohio St. 467, 26 O.O. 29, 49 N.E.2d 52, paragraph five of the syllabus ("Property held by a nonprofit corporation for the purpose of ultimate distribution to such selected organizations as are operated for religious, charitable, scientific, literary or educational purposes * * * is not exempt from taxation under Section 5353, General Code [the precursor to R.C. 5709.12(B)]").

{¶ 34} Third, the BTA emphasized that DCI's indigency policy explicitly stated that it was "not a charity or gift to patients [and that] DCI retains all rights to refuse to admit and treat a patient who has no ability to pay." This statement contradicts the assertion that DCI is committed to providing services on a nondiscriminatory basis, which is an essential prerequisite for a healthcare provider to qualify property for exemption. DCI argues that its articles of incorporation set forth its charitable purpose and that other evidence demonstrates that in actuality persons are not turned away for inability to pay. We are not persuaded, however, that this evidence required the BTA to find that DCI satisfied the nondiscrimination requirement, given that DCI's own policy statement explicitly reserved the right to refuse to treat indigent patients.

{¶ 35} DCI contends that the legal constraints imposed on it as a Medicare provider excuse it from complying with Ohio's prerequisites for obtaining a charitable-use exemption. This is unpersuasive. First of all, the Medicare statutes and regulations cited stop short of requiring DCI to adopt the

---

4. OHA cites *Akron Golf Charities, Inc. v. Limbach* (1987), 34 Ohio St.3d 11, 516 N.E.2d 222, for the proposition that donating proceeds can qualify an entity as charitable. That case is inapposite because it did not involve a claim of real-property exemption but rather of sales-and-use-tax exemption under former R.C 5739.02(B)(12). Akron Golf Charities was an organization whose sole purpose was to raise funds for charity by staging golf tournaments. DCI is not such an institution, with the result that the earlier case does not apply.

disclaimer of charity set forth in its indigency policy. Second, even if Medicare regulations constrain DCI so that it cannot act as a charity according to Ohio's definition, it is still barred from obtaining a charitable-use tax exemption. For just as federal law does not *establish* the elements of Ohio's tax exemption, federal law *cannot excuse* an entity's noncompliance with those elements. The General Assembly, rather than the courts, must determine whether Medicare providers should enjoy a property-tax exemption, and if so, the scope of such an exemption.

*D. The operation of the West Chester facility does not qualify as an exclusively charitable use of property under R.C. 5709.12(B)*

{¶ 36} In addition to finding that DCI had not proved that it qualified as a charitable institution under R.C. 5709.121, the BTA also made a separate finding that "DCI does not qualify for exemption under R.C. 5709.12(B) as an institution that uses the property exclusively for charitable purposes." *Dialysis Clinic, Inc.*, BTA No. 2006-V-2389, at 12. It is well established that even if it does not qualify as a charitable institution, DCI would be entitled to exemption from tax if it showed that the operations at a particular facility constitute an exclusively charitable use of that particular parcel of real property. See *Highland Park Owners, Inc. v. Tracy* (1994), 71 Ohio St.3d 405, 644 N.E.2d 284 (although homeowner's association that owned real property was not a charitable institution, its use of property as a public park did constitute an exclusively charitable use that was entitled to exemption).

{¶ 37} Under the circumstances of this case, however, the determination of DCI's exemption claim under R.C. 5709.12(B) does not significantly differ from the evaluation of the claim under R.C. 5709.121. Nothing about the operation of the clinic in West Chester differs from the core activities of DCI that were reasonably and lawfully found not to qualify DCI as a charitable institution. The West Chester facility itself does not qualify for exemption.

*E. An institution need not show a particular percentage of care that is unreimbursed if it proves its commitment to providing care on a nondiscriminatory basis*

**{¶ 38}** The Tax Commissioner argues that for a property-tax exemption, case law imposes the requirement that "a healthcare provider furnish[ ] sufficient services to those that lack the financial means to pay for such services," meaning those who lack sufficient assets or insurance. The record here shows that a person at the West Chester facility who lacks financial means to pay is usually entitled to benefits under Medicare or Medicaid, or both. DCI's decision to serve these patients to some extent qualifies as the provision of care to persons who otherwise lack the means to afford it.

**{¶ 39}** But the commissioner's argument goes a step further. When asserting that a provider must furnish services to patients who "lack the financial means" to pay for healthcare, the commissioner means that a provider must furnish services to those patients who do not qualify for benefits under Medicare or Medicaid – or at least those patients for whom benefits have not been obtained. In essence, the commissioner required DCI to show that it provided unreimbursed care – that is, care financed by DCI itself from funds derived either from charitable donations or operating surpluses. The denial of DCI's exemption claim rested in part on the fact that no unreimbursed care was quantified at the West Chester facility and that the amount of such care at all of DCI's Ohio clinics was small. In affirming the commissioner's determination, the BTA stated that if the 1.27 percent bad-debt write-off that related to Medicare patients at its clinics were viewed as charity care, the percentage would be "insufficient to meet the charitable service standards required for exemption." *Dialysis Clinic, Inc.*, BTA No. 2006-V-1389, at 16.

**{¶ 40}** DCI contends that contrary to the pronouncements of the commissioner and the BTA, case law does not require a threshold amount of

14

unreimbursed care. We agree. Because of the existence of Medicare and Medicaid, which reimburse providers for the provision of dialysis services to the indigent, few patients actually receive free care that is wholly unreimbursed. A threshold amount of unreimbursed care is not required, and the commissioner's contrary assertion is unfounded.

{¶ 41} The commissioner relies on *O'Brien v. Physicians' Hosp. Assn.* (1917), 96 Ohio St. 1, 116 N.E. 975; *Cleveland Osteopathic Hosp. v. Zangerle* (1950), 153 Ohio St. 222, 41 O.O. 243, 91 N.E.2d 261; *Lincoln Mem. Hosp., Inc. v. Warren* (1968), 13 Ohio St.2d 109, 42 O.O.2d 327, 235 N.E.2d 129; and *Bethesda Healthcare, Inc. v. Wilkins*, 101 Ohio St.3d 420, 2004-Ohio-1749, 806 N.E.2d 142. Comparing the first three cases, the commissioner seeks to extract a principle that some sizeable percentage of care must be unreimbursed. But this theory ignores the reasoning of the cases.

{¶ 42} In *O'Brien*, the court affirmed the grant of a property-tax exemption but observed that in accepting private-pay patients, an institution must not take on so many paying patients that it cannot accommodate a "usual and ordinary number of indigent patients applying for admission." Id., paragraph six of the syllabus. In the age of Medicare and Medicaid, the usual and ordinary indigent patient may have access to government benefits, and the modern healthcare provider is not required to forgo the pursuit of those benefits to qualify for charitable status.

{¶ 43} The property-tax exemption granted in *O'Brien* was not granted to the owner in *Cleveland Osteopathic*; the court's primary concern in that case was private profit rather than degree of public service. The hospital had appeared to be a means by which the member physicians secured income and profits. Charges to the patient led to a profit in excess of the physician's salary, and the " 'fixing of [each physician's] salary [was] merely a device for securing the profits of the institution and not merely compensation for services rendered.' " 153 Ohio St. at

228, 41 O.O. 243, 91 N.E.2d 261, quoting 2 Restatement of the Law, Trusts (1935) 1167, Section 376, comment b.

{¶ 44} Likewise, the commissioner's reading of *Lincoln Mem. Hosp.* ignores the reason that this court denied the exemption. In *Lincoln*, a for-profit corporate owner's creation of a nonprofit corporation to lease the property was a sham created to pay the for-profit owner's financial obligations. 13 Ohio St.2d at 110, 42 O.O.2d 327, 235 N.E.2d 129. While the court noted the paucity of nonpaying patients, that was not the dispositive consideration.

{¶ 45} Finally, *Bethesda* is inapplicable. In *Bethesda*, a nonprofit corporation sought an exemption for the portion of a building that it leased to itself for accounting purposes; the area housed a fitness facility that was open only to dues-paying members and their guests, with minimal access for the public. The exemption was denied, for although a small number of memberships were given away through scholarships, analogous to giving "free care," the facility itself was not open to the public at large. Id., 101 Ohio St.3d 420, 2004-Ohio-1749, 806 N.E.2d 142, ¶ 38. That is not the situation here.

{¶ 46} Although the commissioner's position is incorrect on the issue whether a minimum percentage of unreimbursed care is required for a charitable entity, the record contains sufficient support for the BTA's ultimate findings. Accordingly, the property-tax exemption for the West Chester facility was properly denied.

### III. Conclusion

{¶ 47} For the foregoing reasons, the BTA acted reasonably and lawfully when it upheld the Tax Commissioner's denial of DCI's claim for a charitable-use exemption. We therefore affirm the decision of the BTA.

Decision affirmed.

BROWN, C.J., and O'CONNOR and CUPP, JJ., concur.

PFEIFER, LUNDBERG STRATTON, and O'DONNELL, JJ., dissent.

**O'DONNELL, J., dissenting.**

{¶ 48} While I concur with the majority's conclusion that no minimum percentage of unreimbursed care is required in order to qualify for a charitable-use exemption, I disagree with the majority's determination that Dialysis Clinic, Inc. ("DCI") is not entitled to the exemption on the ground that it does not provide service in a nondiscriminatory manner because it *reserves the right* to refuse treatment to indigent patients in its effort to comply with Medicare regulations. The reservation of the right to refuse treatment is not proof that DCI denies services to indigents. To the contrary, the evidence shows that DCI provides services to all patients, irrespective of their ability to pay. Because providing service to indigent patients is a charitable act, in my view, DCI qualifies as a charitable institution and is tax exempt. Moreover, because DCI provides services at the West Chester clinic, the clinic is used exclusively for charitable purposes, and the property is exempt from tax. Accordingly, I assert that the determination by the Board of Tax Appeals ("BTA") denying DCI a charitable-use tax exemption was unreasonable and unlawful.

**Facts**

{¶ 49} DCI is a nonprofit entity that is tax exempt under Section 501(C)(3) of the Internal Revenue Code; it provides dialysis services to patients who suffer from end-stage renal disease, and it allocates half its excess revenue to support kidney research and the other half to subsidize its own services. DCI's charter[5] explicitly prohibits it from operating for "pecuniary gain or profit."

{¶ 50} Although many of DCI's patients are covered by Medicare or Medicaid, some patients remain responsible for 20 percent of the services

---

5. DCI is a Tennessee corporation, and its charter is the equivalent of articles of incorporation. See Tennessee Department of State, Filing Guide, Nonprofit Corporations, http://www.state.tn.us/sos/forms/fg-np.pdf (accessed October 6, 2010).

rendered. However, when a patient is indigent and DCI is unable to collect a copayment or deductible, DCI writes off the portion that the patient is unable to pay as a bad-debt expense, eliminating the patient's responsibility to pay. In addition, DCI claimed that it would provide care without charge to patients who are ineligible for or are waiting to qualify for Medicare or Medicaid. In its efforts to comply with Medicare regulations that prohibit a clinic from providing services to non-Medicare patients at a fee lower than the one charged to Medicare patients, DCI established a policy reserving the right to refuse treatment to those who cannot pay. An administrator with DCI testified that DCI does not deny services to individuals "with no means to pay." The record does show that DCI provides services to indigent patients and adjusts the balance as a "Non-contracted Write-off" if patients do not have insurance coverage. As DCI staff attorney William Horn testified before the BTA, "if there are not [sic] payment sources, then [service] ends up being free to [patients] if they have no sources to pay."

## Law and Analysis

{¶ 51} Our standard of review for appeals from the BTA is whether its decisions are " 'reasonable and lawful.' " *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting *Columbus City School Dist. Bd. Of Edn. v. Zaino* (2001), 90 Ohio St.3d 496, 497, 739 N.E.2d 783. This court " 'will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.' " Id., quoting *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino* (2001), 93 Ohio St.3d 231, 232, 754 N.E.2d 789.

{¶ 52} In this case, DCI sought an Ohio charitable use tax exemption pursuant to R.C. 5709.12(B) and 5709.121(A)(2). In *Bethesda Healthcare, Inc. v. Wilkins*, 101 Ohio St.3d 420, 2004-Ohio-1749, 806 N.E.2d 142, ¶ 27, we quoted approvingly from the concurring opinion of Justice Stern in *White Cross Hosp. Assn. v. Bd. of Tax Appeals* (1974), 38 Ohio St.2d 199, 203, 67 O.O.2d 224, 311 N.E.2d 862, which stated that " '*any* institution, irrespective of its charitable or

18

noncharitable character, may take advantage of a tax exemption [pursuant to R.C. 5709.12(B)] if it is making exclusive charitable use of its property.' " (Emphasis sic.) On the other hand, "R.C. 5709.121 does not itself grant any exemption. It merely sets forth certain situations in which real and personal property belonging to charitable or educational institutions * * * may be considered as used exclusively for charitable * * * purposes." *First Baptist Church of Milford v. Wilkins*, 110 Ohio St.3d 496, 2006-Ohio-4966, 854 N.E.2d 494, ¶ 16. In evaluating an entity's charitable status, this court examines the charitable activities of the taxpayer; in evaluating a property's charitable use, this court examines the charitable activities that occur on the property. See *OCLC Online Computer Library Ctr., Inc. v. Kinney* (1984), 11 Ohio St.3d 198, 201, 11 OBR 509, 464 N.E.2d 572 (activities of the taxpayer); *Highland Park Owners, Inc. v. Tracy* (1994)*, 71 Ohio St.3d 405, 406-407, 644 N.E.2d 284 (activities undertaken at the property).

{¶ 53} In *Church of God in N. Ohio, Inc. v. Levin,* 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, ¶ 19, we explained that "the provision of medical or ancillary healthcare services qualifies as charitable if those services are provided on a nonprofit basis to those in need, without regard to race, creed, or ability to pay." Id., citing *Vick v. Cleveland Mem. Med. Found.* (1965), 2 Ohio St.2d 30, 31 O.O.2d 16, 206 N.E.2d 2, paragraph two of the syllabus.

{¶ 54} In denying DCI's application for a charitable use exemption, the BTA concluded that DCI does not conduct any charitable activity at its West Chester clinic because it "charges all patients for dialysis services, voluntarily enters contracts with government and private insurers to set charges for the provision of these services, and does not donate any of its services without charge or at a reduced charge." *Dialysis Clinic, Inc. v. Levin* (Nov. 24, 2009), BTA No. 2006-V-2389, at 13. After noting DCI's reservation of its right not to treat indigent patients, the BTA concluded that DCI's practice of writing off

uncollectible debt does not constitute charity, noting that it could find "no evidence of DCI acting as a donor at any time by relinquishing its legal right to payment from patients for services provided." Id. at 14. According to the BTA, "DCI is not providing its services without an expectation that it will be compensated" by Medicare, Medicaid, or a private insurer and has not shown that it provided a requisite amount of unreimbursed care to be deemed a charitable institution.

{¶ 55} While I agree with the majority that the BTA erroneously determined that a taxpayer must demonstrate a minimum threshold or percentage of unreimbursed care to qualify as a charitable institution, I would further maintain that DCI engages in charitable activities and qualifies as a tax-exempt charitable institution. DCI's reservation of the right to refuse treatment to indigent patients does not defeat its charitable status. The evidence shows that DCI does not exercise this right but instead treats any patient regardless of the ability to pay and writes off any charges that insurance does not cover.

{¶ 56} In my view, the conclusion of the Board of Tax Appeals that DCI does not engage in charitable activities because it reserves the right to refuse to treat indigent patients unduly restricts the definition of "charity" in a manner inconsistent with our previous interpretation of the term. In accordance with our caselaw, DCI is charitable if it operates on a nonprofit basis and does not turn away individuals because of their inability to pay. Contrary to the BTA's conclusions, the charitable status of a nonprofit entity is not defeated because the entity reserves the right to refuse to treat an indigent individual when the institution treats all individuals regardless of ability to pay and does not collect payment from those who cannot pay. In other words, *reserving the right to deny* treatment is not the same as *denying* treatment or *collecting* payment from indigent individuals. See *Taylor v. Meridia Huron Hosp. of Cleveland Clinic Health Sys.* (2000), 142 Ohio App.3d 155, 157, 754 N.E.2d 810 ("reserving a

right is not the same as actually exercising that right"); *Barker v. Geotech Servs., Inc.*, 9th Dist. No. 22742, 2006-Ohio-3814, 2006 WL 2060556, ¶ 8 (same); see generally *Gowdy v. United States* (C.A.6, 1969), 412 F.2d 525, 529 (government's reservation of the right to inspect the work of an independent contractor does not impose a duty on the government to exercise the right); *Rawson v. Brown* (1922), 104 Ohio St. 537, 547, 136 N.E. 209 (the rights of parties to a purchase option contract were not affected until the option was exercised).

{¶ 57} Because there is no evidence in the record that DCI denies services to patients who cannot afford to pay and there is evidence that DCI writes off any charges incurred by patients who cannot pay, it is my view that DCI has established that it provides services "to those in need, without regard to * * * ability to pay" and therefore qualifies as a charitable institution pursuant to R.C. 5709.121(A).  See, e.g., *Vick*, 2 Ohio St.2d 30, 33, 31 O.O.2d 16, 206 N.E.2d 2 (the hospital did not lose its charitable status because "[n]o one ha[d] ever been refused admittance to the hospital on the basis of race, creed, color or inability to pay").  Further, because the West Chester clinic provides the same services in the same manner as DCI, I believe that the clinic is used "exclusively for charitable purposes" pursuant to R.C. 5709.12(B).

{¶ 58} Because DCI qualifies as a charitable institution and the West Chester clinic is used exclusively for charitable purposes, it should qualify for a tax exemption pursuant to R.C. 5709.12(B) and 5709.121(A).  Thus, I maintain that the BTA acted unreasonably and unlawfully when it denied the request for exemption.  Accordingly, I would reverse the decision of the BTA.

PFEIFER and LUNDBERG STRATTON, JJ., concur in the foregoing opinion.

_____

Dinsmore & Shohl, L.L.P., Sean Callan, Seth Schwartz, and Sarah Herron, for appellant.

Richard Cordray, Attorney General, and Ryan P. O'Rourke, Lawrence D. Pratt, and Alan P. Schwepe, Assistant Attorneys General, for appellee.

Jones Day, Chad A. Readler, and Eric E. Murphy, urging reversal for amicus curiae Ohio Hospital Association.

Brindza, McIntyre & Seed, L.L.P., David H. Seed, and Daniel McIntyre, urging affirmance for amici curiae Ohio School Boards Association, Ohio Association of School Business Officials, Buckeye Association of School Administrators, Ohio Job and Family Services Directors Association, County Commissioners Association of Ohio, Ohio Association of County Behavioral Health Authorities, Ohio Municipal League, Ohio Fire Chiefs Association, Ohio Parks and Recreation Association, Ohio Township Association, and Ohio Library Council.

_____